Fackler. I'm with the firm of Moses and Singer, and I'm here today representing First Niagara Insurance Brokers, who was the opposer in the proceeding below. First Niagara Insurance is a small, family-owned firm. Your hope is to be able to establish the rights to the mark with respect to banking and leasing services? That's what you're trying to gain, right? I would clarify that, Your Honor. I believe that we're saying that the applicant is not entitled to register that identical mark for either insurance services or the related banking and leasing services. Why? Well, because we have been using the mark for significantly longer than they have, and as the Board found... But that isn't the test. The test is whether there's going to be some confusion, some harm, some market harm. And when you have complete geographic separation and there's no chance for any overlapping business, how can there be any worry that there's going to be an economic harm here? Your Honor, I'm glad you brought that up. There are a couple of answers to that question. First of all, the notion of complete geographic distinctiveness is simply counterfactual. It's not supported by the record evidence. As a preliminary matter, as the Board... Wait a second. They can't... The Canadian company and U.S. company can't insure the same risks, can they? Indeed, they have. And there's record evidence... What's the evidence that they insured the same risks? For example, in the appendix at pages 212, 213, and 562 to 564, there's testimonial and there's a yacht. For a certain period of time, he insured that yacht through Applicants' Insurance Division. This was before they changed the name of the insurance division to First Niagara. Later, Mr. Switzer insured that very same yacht through a poser. Does the yacht move from the Canadian side to the U.S. side? No, Your Honor. Mr. Switzer was a resident of the United States the entire time. He also had property in Canada. He had property in both areas. Both insurance policies covered the navigation of that boat through both Canadian waters, U.S. waters, irrespective... Aside from that one example, is there any other one? Yes, indeed, Your Honor. There's also evidence of life insurance policies that were issued to U.S. residents. Mr. Hoskins was one and Mr. Walker was another. There is certainly other evidence of these sorts of actual examples. That's it, huh? Those three examples? Well, Your Honor, there's a more important reason why this... The answer is yes. Those are the only three examples. Those are the only three examples I can call to mind in the record right now. That is true. Is there any evidence in the record that your client ever used the mark in connection with the offering of financial or leasing services? Certainly, there is letterhead. There's correspondence. Between... Which type of... There's one example of an annuity policy. It's the only one I can find, right? Right. This is a person that presumably may have had some insurance dealings and got the annuity. Is there any evidence in the record that when that one annuity was sold, that the customer was presented with the trademark? I believe there's testimonial evidence. Where? I don't have a record. I didn't see any evidence in the record that your client had ever actually used the mark in connection with its alleged banking. I don't see any evidence that you've ever done any leasing. That is correct. Never done any leasing. That is correct, although... But you're not providing U.S. services. Why are you worried? Well, Your Honor, as a preliminary matter, perhaps the most important point here is that the applications at issue, and that is the test when we're examining the applicant's services and the likelihood of confusion, are not geographically limited. Those applications cover any sort of insurance services. They would cover providing insurance, brokerage, and counseling services with respect to Canadian properties. In fact, Mr. Hoffman testified... Judge Rader, with all due respect, I disagree. We do supply services that are received in the United States. These U.S. resident customers, whether it's through phone, whether it's through fax or email, we provide ongoing... Your point is that a United States citizen can come to your client if they want to, and your client can provide them with services. And, in fact, they do. You simply cannot come across the border yourself, your client, and offer those services. There are certain complicated insurance regulations that govern the manner, particularly that the initial contact gets made. However, with respect to the ongoing services, renewals, consultation with changes to policies, helping with processing claims, much of that occurs directly with U.S. customers while they are in the U.S. This is paradigmatic international trade where the services are being rendered in a combination of Canada because the client... You wouldn't be here today unless we had found that you had made a sufficient showing before that the mark was used in the United States common. That's correct, Your Honor. But if I could just briefly return to the point about the question of geographic separation. As I mentioned before, the applications, and that's what we have to be looking at, are not limited geographically. The head of their insurance division, of applicants' insurance division... What we have here, don't we, is a decision by the board that is based primarily on the lack of relatedness between banking and leasing services and insurance, right? That's correct, Your Honor, and that's the only basis. And that's a factual issue, right? That is correct. Okay. And I've read the cases that you cite. You suggest there's some sort of automatic presumption of relatedness between insurance and banking services. I don't read the cases as saying that. What's the actual evidence in this record of relatedness? Your Honor... Is it just these internal e-mails that you rely on? No, Your Honor, not at all. We cited to a large number of documents directly from applicants' own files. Well, that's what I'm talking about. Okay, well, these were not e-mails, Your Honor. These were SEC filings. These were representations. I misspoke when I described them as e-mails. I'm talking about these documents. Yes. I've looked at those documents. They don't seem to me to suggest that, in general, that consumers assume that somebody who's offering banking services will offer insurance services as well or the other way around. Well, Your Honor, I would have to... They suggest that this particular organization wants to offer both of those services. It suggests that they want to change the name from Savings Bank because then people would assume that they don't offer those services. But there isn't any suggestion in there that the population in general assumes that a bank would offer insurance services or that an insurance company would offer banking services. I would respectfully disagree. A number of those documents... Show me one. Show me your best one, okay? Well, as one example, there was a 10-K filing that we cited where they discussed the fact that their banking division faces direct competition from insurance companies. But that doesn't say that consumers assume that banks offer insurance services. It's just saying that in their individual case... Well, but in their documents, they mentioned, specifically mentioned marketing research they had done that indicated, first of all, that the consumers were desirous of obtaining these services from the same company and specifically that the first Niagara Mark itself tested resonated with these very market research customers. So I would argue that that is evidence. I mean, the question here is consumer expectation. This market research that they did... Show me. Where? Uh... Okay. I know that we cited specifically to the document that mentioned the market research. The pinpoint site is escaping me at the moment, but I'm quite confident it's in the briefs. It's helpful. It's become prepared. Yeah, sure. This is not sort of a peripheral issue. I apologize. The particular market... I didn't anticipate that the particular market research language itself was going to be a focal point. Well, if you can't find it, maybe you can do it on the reply. I appreciate that, Your Honor. But again, returning to this point about the ability of the applicant to provide services geographically distinct, you know, related to Canadian insurance, the head of their insurance division testified at the very same pages that applicant cites for the proposition that they don't offer those services. He did discuss ways in which they could offer those services. And so again, I think that the focus has to be on whether the application could cover insurance on Canadian properties. I would also note that to the extent that applicant alleges that the board didn't consider this 12th factor of the extent of potential confusion, as a preliminary matter, the board did consider that issue. They considered it in conjunction with the actual confusion factor. The board did find that there was actual confusion and merely minimized the impact because of this allegation that the services were geographically distinct. As I've already spoken about, the fact is they're not geographically distinct. Both the customer base is... Both companies do business across border. The evidence of actual confusion you're talking about now, is that the e-mails? Yes, that is correct. That's where the two had e-mail addresses that were virtually the same? That is correct. And so like when I knew I was trying to reach First Niagara in the United States, I actually typed in the hyphen or something and I got somebody else? That is correct. There was one example of it... But they knew who they were trying to reach and there was no business lost, was there? There was no business lost. But in situations like this where you have a senior user who is a small business and a larger user comes in after the fact, there's a separate type of commercial harm where the senior user will lose the ability to control their reputation and the secondary meaning associated with the mark. So diverted sales are not the only type of commercial harm that's recognized by the Lanham Act. And certainly the consumer confusion itself is a significant harm. I'd just like briefly, if I could, to point you where I found the page of at least one example of this question and answer relating to the market research. In the appendix at page A1189, this was a question and answer document that was used to respond in various contexts for the reason for changing the mark. In the last question and answer sequence at the bottom of the page, what is branding and how does changing our brand fit into the long-term goals? The last full paragraph on the page refers to extensive market research revealing that customers in the commercial market do not equate a savings bank with offering a full array of services that small and medium businesses need. Similar consumers of all type do not consider the savings bank. So they are talking here about the issue with the savings bank. But it then goes on to note that these sorts of consumers do recognize First Niagara as representing this sort of full service combination of services. So that would be one example of market research that was done. But that market research shows that as a general proposition, the public does not associate banking with leasing or insurance? Banks, if they're only represented as local savings banks. But then there's all these other categories of banks, including the banking business. But it's a perception that your client would like to change by being able to have a mark that covers all the services. Certainly. The existing lay of the land, if it's suggested to me that this thing you just pointed to me struck me like it counted against you and not for you. Well, I would suggest that as long as there are some banking services that are associated, again, there's no limitation in the applicant's applications to banking services for local savings. But it just doesn't say that consumers assume that banks offer insurance or that insurance companies offer banking services. Well, Your Honor, I would suggest that if you look at the totality of these documents, they say that the very purpose for this rebranding was to capitalize on that customer perception. That was the very reason. But you measure the confusion, the snapshot, before your client changes the world. What you're showing us here is what the world was thinking when your client decided that it wanted to somehow change thinking was that the ordinary bloke doesn't associate with a savings bank anything other than a savings bank. Right? That's what this research proves. But I think the research also proves that it will associate a bank with these other services as long as it's not characterized as a local savings bank. No, I think what it shows is that you can convince consumers that you can offer both things if you change your name. It doesn't show that consumers will assume that you offer both things if you change your name. Again, I suppose I would just have to respectfully disagree. I think that the totality of the evidence points in the direction that was the very purpose for the name change. I see that I'm down to very little. Thank you, Mr. Fackler. Thank you. You consumed your rebuttal time, but we'll restore it. And if you could give Mr. Perlman an additional three minutes, should he need to use them, then our time will be almost even. May it please the Court. Your Honors, I represent First Niagara, United States. The first issue I'd like to go to, if I could, is the issue that we've all been discussing, and that is the relatedness of banking and leasing to insurance. The Trademark Trial and Appeal Board addressed that issue, and they found that there was insufficient evidence in the record to show relatedness between those services. I think Judge Dyke's question really focuses on what's important here, and that is that it's not enough to show that a single business might offer both banking and insurance. The test, really, is do consumers believe that if an insurance company has a particular name and some bank has a particular name, that the services then emanate from the same entity? That's what this Court decided in Ray Kour's case. Having conceded that distinction, then you have no complaint with the Board's entire outcome, right? You don't feel that you have any particular right to use the marks with respect to insurance services? We do, Your Honor, and we have cross-appealed on that. The reason for our cross-appeal is to acknowledge the distinction. Why doesn't that distinction cut against you pretty heavily when you wish to move into the insurance coverage for this particular mark? The reason for that is that in the insurance area, there is a geographic separation here. The 12th DuPont factor is, is there a real likelihood in the real world that there being confusion? In the electric design case, this Court said that we're not concerned with mere theoretical possibilities. We're interested in commercial possibilities. But the same geographic separation exists for banking services as for insurance services. Why do you feel like there's some different effect that it has in the insurance area? I don't think that the geographic difference has a different effect in the insurance area. I think it should be given the same effect that it was given in the banking and leasing area. I think the mistake that the TTAB made here is when they were looking at the factor of channels of trade and customers. What they did is they said, we have to assume that all channels of trade are available because there's no limitation in my client's applications. The case that they cited in making that decision was a case where the opposer had a registration. That's not the case here. In this case, the opposer does not have a registration. You have to look at how the opposer actually uses the mark for insurance. That approach is within the explicit wording of the second DuPont factor, which says the similarity or dissimilarity in nature of the goods or services as described in the application or registration or in connection with which a prior mark is used. The mark is exactly the same for purposes of insurance, and you conceded that. The example of the fellow with the boat, there's direct overlap of the service, right? For a de minimis number of customers. In that case of the yacht, it was based in Canada and so it was moved. But the TTAB explicitly found it's a finding of fact. There's been a whole lot of talk about this relatedness, confusion issue even on insurance. From which customer are we worried about being confused? For example, if your client in Niagara Falls, United States, starts advertising on the television and whatnot, First Niagara for insurance services, right? The folks over on the other side of the falls in Canada are going to see that advertising. Are they going to get confused? Because they've been inundated with advertising on their side of the fence by First Niagara Canada with exactly the same mark. Well, there's absolutely nothing in the record to indicate that anybody in Canada has been confused by any advertising from my client. The TTAB characterized that type of advertising as spillover advertising. Yeah, but it's real. It happens anywhere across the board. Anywhere you get a near border, sure. But there's nothing in the record to indicate that anybody is confused. The people who are in Canada who see that advertising, the First Niagara company... The test is likelihood of confusion, right? That's right. The board here found there was a likelihood of confusion with regard to insurance services. They did and they based that on the fact that there was no limitation in channels of trade. But when they talked about advertising, the TTAB minimized the effect that advertising would have and said the spillover was minimal between the countries. And that's the type of thing that's expected between borders. But insurance is a little different in the sense that people could own property in both places and wish to insure it in both places and, therefore, have some reason to do business with insurance companies, both in Canada and the United States. And, therefore, there could be confusion, right? Well, it is true that, as your Honor says, somebody can own property in both countries. But mostly how First Niagara Canada works, and this is at page 186 of the record, they work through sophisticated brokers. There was a question asked at Mr. Maeve's deposition. He's a principal of First Niagara Canada. Well, do you deal directly with people? And at page 186 of the record he says, well, that's really not done. It's done through brokers, sophisticated brokers. What case of ours have we held where there's an identical mark or a substantially identical mark in the same type of business that the board should be reversed because it's found likely to have confusion? I can't cite a case to you. And I think the difference is that, in this case, we have a Canadian licensed insurance company and a U.S. licensed insurance broker, brokers on both sides. I don't think that situation arises in any existing case. It's not likely that a broker in the United States is going to be confused about which country to go to to refer business for a Canadian cottage. And there's really no likelihood that there's going to be confusion of somebody going to First Niagara Canada and asking for insurance from the United States. The likelihood of confusion is going to happen later on if the decision stands because your client is going to be able to use its mark on, call it banking services, and have spillover advertising. You'll be able to argue we're a full-service bank. You could even say we're a full-service bank that offers insurance. You won't be using the mark with respect to insurance. That ad will spill over into Canada, and then the Canadian folks will be running their ads on television saying, we sell insurance. What's the customer supposed to think? Who provides what services? Isn't the case a sport in a way, in essence, because of the geographic overlap, the border issue? Well, the TTAB found as a finding of fact that the geographic scope of these services is not overlapping. That's at page 829 of the record. It's a factual finding from the TTAB. Suppose that's true. I mean, you can still have likelihood of confusion even if there is absolutely zero competition between the two companies, right? You could have confusion, but in this case, they're between businesses that are in different countries. It's not the same as if you had a business in Pennsylvania and a business in New York and there was confusion within the United States. Because of the highly regulated nature of insurance, and the TTAB pointed to the highly regulated nature of insurance, here you have a situation where we can't perform their services, they can't perform our services. But the point is that the fact that they're barred from competing with each other doesn't solve the confusion problem, the likelihood of confusion problem, because there are cases in which there was no actual competition for customers, and yet we've held that there can be a likelihood of confusion under those circumstances. So you keep emphasizing the de minimis nature of the competition, but that doesn't answer the whole question. It is true that that does not dispose of the issue per se, but as the TTAB found, and this is a quote from the TTAB, this lack of commercial injury or opportunity for such is not dispositive per se, which is exactly what I'm saying, but it's a significant factor in this highly regulated industry. So what you do is you go to the 12 DuPont factor, which says what is the likelihood of confusion? Is it de minimis or is it substantial and real? And in this case, the TTAB, all of their factual findings on insurance and on banking, found that there really is very little, I think the term of the TTAB was extremely limited potential for any commercial confusion, and I think the only reason the TTAB found in favor of First Niagara Canada in the insurance issue is they misunderstood the channels of trade and thought that they had to look at all channels of trade, whereas in this case, since the opposer does not have a registration under the second DuPont factor, you have to look at how they actually use the mark, and how they actually use the mark is they sell Canadian brokerage services. That's a different service from what First Niagara United States is selling. I would like to raise one issue about reverse confusion because Mr. Fackler had raised that. That was an issue that was not argued or raised by First Niagara Canada in front of the TTAB. They didn't raise it in front of the TTAB the first time. They didn't discuss it before this court when they were up here last time. They didn't discuss it with the TTAB when it was remanded, and it's raised for the first time on appeal here. This court in the Hoover case declined specifically in that case to address an issue when it hadn't been briefed, when evidence hadn't been admitted, and it just had not been addressed by the TTAB. Simply because First Niagara Canada changes counsel between the last appeal and this appeal does not mean that they should be able to come up with a whole new set of arguments that the administrative agency never had an opportunity to look at. So reverse confusion should not be considered. We've addressed in our brief on the merits why we don't think reverse confusion exists here, but it's an entirely new issue raised, and it should not be raised for the first time. If I can, I would like to go back to banking just for a moment. Again, on the relatedness issue. Your Honors had asked questions about what the record evidence was. The record evidence here is there isn't a bit of evidence anywhere in the record that despite the fact that First Niagara Canada has used the First Niagara name since 1984, they've made no move to go into banking. They've made no move. They admit they aren't in leasing of any type at all, and they've made no move to do that. Mr. Maves testified at page A245 of the record. Don't they have a right to protect the integrity of their mark even if there's not an exact correlation with their services? Well, I guess that would depend on what exact correlation means. Here the TTAB found that there was really no relatedness between the banking and leasing and the insurance on the other hand, and the facts bear that out. There's financial services. I mean, there's a large umbrella that could sweep them both in. I don't think so. If we look at the particular facts here relating to financial services, they have no electronic banking, and that's what First Niagara U.S.'s application was for. That's at page A245 of the record. They're not licensed to provide banking services in any country. They mentioned an annuity. They sold one annuity. There's one annuity in the record that's at page A181. That was an annuity that was sold to a Mrs. Clutterbuck who's from Canada. Absolutely no evidence that there is any annuity of any type sold to anybody in the United States. Doesn't Mr. Fackler have a point? A small company could easily get kind of swept aside by a large company who takes their mark and with its superior advertising capability kind of swamps the market with that mark being used in a different context. Suddenly their use of the mark is completely eroded. That's the reverse confusion argument. That's the one that's being raised for the first time on this appeal. We've cited cases in our brief. We've addressed reverse confusion and cited Professor McCarthy and the Checkpoint case out of the Third Circuit. What the Checkpoint case and Professor McCarthy say is that there is not reverse confusion where the services are not competitive. I think certainly as to banking and leasing, the services are not in any way competitive. I don't think they're competitive for insurance because of the different regulatory schemes that the two clients operate under. Second, the respective markets are separated. We have that here except for a couple of examples of U.S. citizens who have property or some kind of nexus to a Canadian insurable interest. And finally, that the advertising is directed at different types of purchasers. Here's what the TTAB said about that third factor in advertising. They said that First Niagara Canada's, quote, advertising is directed at Canadian purchasers and there's only minimal spillover in New York of its advertising on a single Canadian radio station. And they also said that because of the very nature of insurance brokerage services, it's unlikely that a U.S. resident who hears advertising for their services or vice versa would inadvertently go to the wrong country because they're a Canadian insurance broker or a U.S. insurance broker. The services are separated. They're not related. And for that reason, we would ask that this court affirm the TTAB's finding as to banking and leasing applications. That was 12 out of the 15 classes in the six applications. And reverse this to insurance because using the paradigm that this court set out in electronic design, in that case, there really is no likelihood of confusion. And actually, to get back to Judge Rader's question about can't there be confusion even in the absence of competitive products, in the electronic design case. It's more of a form of harm akin to dilution, akin to some erosion of the value of the mark. Of course, in this case, First Niagara Canada has admitted that its mark's not famous, so the normal dilution principles don't apply. That's why I said akin to dilution. Sure. But in the electronic design case, this court said that the confusion you're looking for is purchasing confusion, confusion by purchasers. And so TTAB found the chances or the opportunity for that type of confusion is, in the words of the TTAB, quote, extremely limited. For that reason, then, we ask affirmance on the banking and leasing decisions, reversal on the insurance decision. Okay. Thank you, Mr. Perlman. Mr. Backler, you have your three minutes of rebuttal time. Thank you, Your Honor. With respect to the reverse confusion issue, first of all, I would point out, I think that many, if not most, of the arguments raised by an applicant were not briefed in the trial briefs below. I think it's safe to say in Canada to the court. Which ones in particular, since you're doing a tit-for-tat here? Well, Your Honor, and I don't want to – I'll retract. I mean, it's true that you didn't raise this issue, the reverse confusion below, right? Your Honor, it was not expressly argued as such separately from forward confusion. That is true. Under what guise was it argued? Well, I would say that the best we could say about it is that the facts that were being – present the classic case of reverse confusion. Sure, but that happens all the time. The facts present an argument somebody could make, and a lawyer says, I'm not going to make that one. At least a waiver. Well, I would say, though, Your Honor, in this instance – Do you have any specific example of your adversary here presenting arguments to this court that weren't presented below? You made that challenge just a moment ago. Again, it really was not my purpose to get bogged down in the tit-for-tat with the limited time that I have. Well, you'll take that one back. I will take that one back for the purposes of the rebuttal. What is your client going to do when this larger entity starts advertising all around Niagara Falls and whatnot that they are a full-service financial institution providing full range of services, including insurance of all different kinds? Your Honor, that indeed has been happening during this time, and that is the reason – So long as they don't actually slap their First Niagara mark on the insurance service, they're going to be able to talk that talk, right? It all depends. Again, this is in a right-to-use context, not in a right-to-register context, I believe your question. But certainly, to the extent they use the umbrella mark of First Niagara Financial Group in connection with insurance services, I don't think that they're allowed to do that. There's a case pending, right? Indeed, Your Honor, there is a case pending. Indeed, Your Honor, there is a case pending. But with respect to reverse confusion, which has been fully briefed, at least at the appellate level, we did argue it from our opening brief on. And the other side has had the opportunity to respond. In re shell oil is the case. This is a federal circuit case. Not only is it a case involving this very type of harm, and it describes the danger to a smaller company in having its goodwill and ability to control secondary meaning taken away. It's a federal circuit case, unlike the checkpoint case. And it also specifically notes that non-competitive, even non-competitive, and even goods or services that are not intrinsically related can still cause likelihood of confusion, particularly where the marks are identical, as they are in this case, and there's some overlap. Shouldn't an opposer be allowed to mount an opposition against a mark that's proposed for a particular use when the opposer has never engaged in that line of work and has made no showing that they proposed to? Let's assume for purposes of argument that this is leasing. Okay. Let's assume for purposes of argument that your client had never sold an annuity, never ever mentioned to anybody that they were providing anything other than pure insurance services. Yes. Well, I think what's wrong with a presidential ruling of this court that says such a person lacks standing to oppose the mark someone's seeking for their use, something where they're using it? Because I think that runs directly contrary to this Shell Oil case, which specifically says and incites to a board the K2 decision. K2 decision before the board, you had goods that were skis and cigarettes, and there was a likelihood of confusion found. Shell Oil approved of that rationale, particularly in a reverse confusion setting where you have a smaller senior user, because that is precisely the harm. The harm is different than saying they might expand into that area. The harm is that people are going to lose control of the distinctiveness of that. It's true. As Judge Rader mentioned, it's almost akin to dilution, although it is different, and it's recognized in Shell Oil specifically even when goods are not found to be related or competitive. So checkpoint, I would argue, is an apposite. It's in the wrong circuit, and Shell Oil runs directly contrary to that. Thank you, Mr. Backler. Thank you. Our final case this morning is Fortunet v. Planet Energy.